IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF MISSISSIPPI
EASTERN DIVISION

| | | |
|---|---|---|
| POWERTRAIN, INC., a Mississippi Corporation; TOOL MART, INC., a Mississippi Corporation; WOOD SALES COMPANY, INC., a Mississippi Corporation, | ) ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | |
| AMERICAN HONDA MOTOR CO., INC., a California Corporation, | ) ) ) | |
| Defendant. | ) ) ) | |
| _____ | ) ) | Civil Action No.: 1:03CV668MD |
| AMERICAN HONDA MOTOR CO., INC., a California Corporation, | ) ) ) | **PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF THEIR MOTION IN LIMINE TO EXCLUDE EVIDENCE OF HONDA'S SURVEYS** |
| Counterclaimant | ) ) ) ) | |
| POWERTRAIN, INC., a Mississippi Corporation; TOOL MART, INC., a Mississippi Corporation; WOOD SALES COMPANY, INC., a Mississippi Corporation; BEST MACHINERY AND ELECTRICAL, INC.; JOYCE MA, Individually; PUMA CORPORATION or PUMA INDUSTRIES, INC.; CHINA NATIONAL ELECTRONICS IMPORT AND EXPORT ZHEJIANG COMPANY; TONG YONG ENGINE MADING, INC., OR SHAOXING TONGYONG ENGINE MADING COMPANY, INC. (d/b/a TEBCO; XING YUE GROUP; and ZHEJIANG EVER FINE ELECTRIC APPLIANCE GROUP, LTD., | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | |
| Counterdefendants. | ) | |
| _____ | ) | |
| POWERTRAIN, INC., a Mississippi | ) | |

1

**Corporation; TOOL MART, INC., a Mississippi** )
**Corporation; WOOD SALES COMPANY,** )
**INC., a Mississippi Corporation,** )
                                                                    )
         **Cross-Counterclaimants** )
                                                                    )
         **v.** )
                                                                    )
**AMERICAN HONDA MOTOR CO., INC., a** )
**California Corporation** )
                                                                    )
         **Cross-Counterdefendant.** )
_____ )

In its Motion for Partial Summary Judgment, Honda cites from two surveys which it elicited long after it wrote its threat letter, which it did not intend to follow-through on, to PowerTrain in 2003. Plaintiff Power-Train hereby moves this Court to exclude the surveys.

**I.**

**STATEMENT OF THE CASE**

The surveys should be excluded from consideration on the pending partial summary judgment motion, which involves defendant Honda's "good faith" in making its "trade dress" allegations, and whether or not those allegations were a "sham" so as to eliminate the Noerr-Pennington defense, because they were conducted long "after the fact" of defendant Honda's assertions that are at issue. They are therefore utterly irrelevant to that issue. F.R.E. 402.

In fact, one case specifically did have sufficient doubts about a Gabriel Gelb survey to refuse to consider it on summary judgment.

Further, they should also be excluded, both on partial summary judgment motions, defendant Honda's Daubert motions, and from trial, because they each contain at least one critical "fatal flaw" – they survey a "universe" which is admittedly dominated by Honda, that being renters and rental yards. (Honda Undisputed Fact #3). However, Honda's witnesses and documents make

clear that the relevant "universe" for purposes of this case is the market in which Honda and PowerTrain compete – that of Original Equipment Manufacturers ("OEM"s.)

Plaintiffs also believe that defendant Honda's intentional choice of an improper "universe" to guarantee it some result it could throw in front of a Court is further evidence of defendant Honda's "bad faith".

II.

### THE SURVEYS ARE IRRELEVANT BECAUSE THEY ARE "AFTER THE FACT'

Honda's "threat letter", which it claims was written in a "good faith" belief in the rights asserted in it, was written on July 10, 2003. (See Honda Bates No. 174-176, attached hereto as Exhibit 1)  However, both surveys were conducted long after that letter, clearly indicating that they have no relevance to Honda's "good faith" belief in anything at the time it wrote the letter.  Further, the Gelb survey was taken in April of 2005 (See Gabriel Gelb Survey, attached hereto as Exhibit 2)**,** long after Honda had sent numerous additional threat letters and in fact had sent such letters to witnesses in the present case; the Mantis survey was taken in the summer of 2006 (See Exhibit 3, Mantis Survey), which was long after not only had Honda sent numerous additional threat letters, but also after Honda had its lawyer, Steven Nataupsky, personally appear at a trade show in October of 2005 to post notices to the relevant customers that they would be sued for purchasing PowerTrain engines. (See #124 to Plaintiffs' Response to Defendant's Statement of Undisputed Facts)

In short, the surveys are both "after the fact" attempts to justify Honda's misconduct, and have no relevance to Honda's "good faith" belief at the time of its misconduct.  They should be excluded under Federal Rule of Evidence 402 as irrelevant; and at a minimum under F.R.E. 403 as more prejudicial than probative.

## III.

### SURVEYS WITH "FATAL FLAWS" ARE INADMISSIBLE

Both of Honda's surveys, as one would expect from surveys which attempt to justify misconduct "after the fact", suffer from numerous flaws. *Citizens Financial Group, Inc. v. Citizens Nat. Bank of Evans City*, 383 F.3d 110, 122 (3rd Cir. 2004), citing *Daubert v. Merrell Dow Pharms., Inc*., 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993):

> The District Court was concerned about the propriety and trustworthiness of Reitter's survey. A "universe" is "that segment of the population whose perceptions and state of mind are relevant to the issues in the case." *McCarthy on Trademarks and Unfair Competition* § 32:159 (4th ed.2003). "A survey of the wrong 'universe' will be of little probative value in litigation." *Id.* The Court noted that the proponent of the survey bears the burden of proving that the universe is proper. *Id.; see also* 3A *Callmann on Unfair Competition, Trademarks and Monopolies* § 21:67 (4th ed.2001).
>
> …
>
> CNBEC's argument that any problems of Reitter's survey should have affected only its evidentiary weight but not its admissibility is also unpersuasive. The District Court excluded the survey because Reitter's methodology was fundamentally flawed and because the danger of undue prejudice far outweighed the limited probative value of the survey, especially for a jury. The courts have held generally that mere technical unreliability goes to the weight accorded a survey, not its admissibility. *See, e.g., Southland Sod Farms,* 108 F.3d at 1143. The Court in this case concluded that Reitter's survey did not suffer from mere technical flaws, but from fatal flaws. Thus, the Court appropriately fulfilled its duty as a gatekeeper in excluding this evidence.

Here, the relevant market is the consumers of the PowerTrain product, as it is those consumers with which Honda is concerned – i.e., those are the users which PowerTrain might take from Honda. This is known as a "forward confusion" case – i.e., where the confusion, as alleged by Honda, between its engines and PowerTrain's, will occur in the future. The applicable law is well stated:

It is well-established "that the proper universe in a forward confusion case is the universe of potential purchasers of the junior user's product, here, the cooler drinkers who may purchase

Glacier Bay." *National Distillers Products, Col., LLC v. Refreshment Brands, Inc.*, 198 F.Supp.2d 474, 483 (S.D.N.Y. 2002) (here, that would be PowerTrain); *Hutchinson v. Essence Communications, Inc.,* 769 F.Supp. 541, 565 (S.D.N.Y. 1991); <u>McCarthy on Trademarks and Unfair Competition</u>, Section 32:159 (4th Ed. 2003). In fact, excellent confirmation of that principle is that Gregory Mantis, Honda's "likelihood of confusion" expert, is expressly mentioned by Court in *National Distillers' Products*, as having surveyed the customers of the junior user (here, PowerTrain). 198 F.Supp.2d at 483.

As McCarthy states:

> The first step in designing a survey is to determine the "universe" to be studied. The universe is that segment of the population whose perceptions and state of mind are relevant to the issues in the case. Selection of the proper universe is a crucial step, for even if the proper questions are asked in a proper manner, if the wrong persons are asked, the results are likely to be irrelevant." Id..

### IV.

### BOTH SURVEYS HAVE A FATAL FLAW – THE WRONG "UNIVERSE"

One "fatal flaw", which is sufficient to exclude both the Gelb and the Mantis, is that both surveys use a "cherry-picked" universe of people who are surveyed – **rental** businesses. The Gelb survey was limited entirely to this skewed market segment. However, this market segment is "totally dominated by Honda". Honda admits its own market power in this narrow segment in Honda's statement of undisputed facts, filed on May 15, 2007, at number 3. (See also Expert Report of Sandra Cogan, June 14, 2005, ¶25**,** attached hereto as Exhibit 4) Since Mr. Gelb's survey was of "secondary meaning," the fact that the market segment was intentionally narrowed to be one "totally dominated by Honda" was an intentional effort to so narrow the universe as to obtain favorable results. By limiting his survey to only include "defendant Honda's customers and

prospective customers" (June 14, 2005 Cogan Report, ¶34, #1.), Mr. Gelb essentially guaranteed that those people would recognize a Honda engine.

As for Mr. Mantis, his "universe" was equally irrelevant, although it went slightly further – 54+% of his respondents were from rental yards, 43+% were from Equipment Purchasers/Renters, and only about 2.5% (a statistically insignificant number) were from the key market segment – OEMs. (Moreover, of those few OEMs, the majority were NOT confused between the engines.) (See Sandra Cogan Expert Report, March 13, 2007, ¶37, attached hereto as Exhibit "5").

It is important to note that Honda is disingenuous when it informs the Court that Mr. Mantis tested the "likelihood of confusion" issue – the issue is properly framed as "likelihood of confusion among potential customers". Honda leaves out the clause "among potential customers" because it deliberately made certain that his survey did **not** survey potential customers of both Honda and PowerTrain, which was necessary to make it a valid survey.

We note that Dr. Cogan finds numerous other flaws in both the Gelb and Mantis surveys, namely that the survey questions were improperly framed, the visual stimuli were inaccurate, there were serious questions with the validation of the surveys, etc. However, these flaws are not just ones which go to the weight of the evidence, but are fatal to giving either survey any credence at all. *Beacon Mut. Ins. Co. v. Onebeacon Ins. Group*. 253 F.Supp.2d 221 (D.R.I. 2003), stating that "Courts have stated many reasons for excluding survey evidence due to fatal flaws in methodology of design or implementation." *See, e.g., Spraying Systems Co. v. Delavan, Inc.,* 975 F.2d 387, 394 (7th Cir.1992); *Nat'l Football League Properties, Inc. v. Green Bay Packers, Inc.,* 57 F.Supp.2d 665, 673 (E.D.Wis.1999); *American Basketball Assn. v. AMF Voit, Inc.,* 358 F.Supp. 981, 986 (S.D.N.Y.), *aff'd w/o opin.,* 487 F.2d 1393 (2nd Cir.1973); *Starter Corp. v. Converse, Inc.,* 170 F.3d 286, 296-297 (2nd Cir.1999).

However, for purposes of this motion, the fact that both Honda surveys focused entirely (Gelb) and largely (97.5% - Mantis) on people in a market sector dominated by defendant Honda is enough to invalidate them substantively. Moreover, it is pure bad faith to do what Gelb did – select the market sector most familiar with Honda engines, determine that a substantial number of people in that narrow sector recognize the Honda engine, and then conclude that the engine has "secondary meaning" throughout the entire marketplace. And it is just as pure bad faith to do what Mantis did – ask people in market sectors where PowerTrain does not participate significant if they might be confused if they saw a PowerTrain engine, but omit the market sector (OEMs) that are familiar with PowerTrain.

Key here is that defendant Honda knows that the only significant market sector involved in this case is OEMs. Evidence of this is:

Scott Conner, Defendant Honda's chief in charge of selling engines, admitted that the relative competitive market for engine sales is to Original Equipment Manufacturers (OEMs). Conner stated that Honda does not sell a power washer, but they sell the Honda engine to OEMs to be placed on power washers. (See Deposition of Scott Conner, June 15, 2007, page 18, lines 18-25, attached as Exhibit "15" to Plaintiffs' Response to Defendant Honda's Statement of Undisputed Facts)

Conner further states that Honda sells to construction and industrial OEMs, and emphasized: "Our distributor network sells engines for hundreds of different OEM products, …" (Id at page 19, lines 18-22, attached as Exhibit "16" to Plaintiffs' Response to Defendant Honda's Statement of Undisputed Facts)

In fact, some OEMs are so large that Honda sells the engines directly to the OEMs and not through its distributor network. Mr. Conner uses as an example, the OEM MTD or Modern Tool & Dye Corporation, stating that MTD buys between 300,000 and 400,000 engines directly from

7

Honda each year. (Id at page 21, lines 1-17, attached as Exhibit "17" to Plaintiffs' Response to Defendant Honda's Statement of Undisputed Facts)  Another OEM, Black & Decker, buys between 400,000 and 500,000 engines from Honda each year.  (Id at page 96, line 25; page 97, lines 1-7, attached as Exhibit "18" to Plaintiffs' Response to Defendant Honda's Statement of Undisputed Facts)

Rock Reed, Honda's manager in charge of selling Honda generators, concurs with Mr. Conner that the OEM customers are an important market to Honda.  (See Deposition of Rock Reed, June 15, 2007, page 64, lines 8-13, attached as Exhibit "19" to Plaintiffs' Response to Defendant Honda's Statement of Undisputed Facts)

Moreover, Mr. Conner emphasizes that the sales of Honda engines to OEMs had become such a large part of Honda's business that the Honda engine division had become a threat to Honda's power equipment group.  Mr. Conner states in referring to a PowerPoint Presentation by Rock Reed's power equipment division titled, *Industrial Business Threatened With Honda Engine OEM Sales*, that: "My organization had made enough progress to be a threat to my sister organization. …we sell to OEMs." (See Deposition of Scott Conner, June 15, 2007, page 79, lines 23-25; page 80, lines 1-15, attached as Exhibit "20" to Plaintiffs' Response to Defendant Honda's Statement of Undisputed Facts)

Steve Bailey, the Vice President of Honda's Power Equipment Division, highlighted the importance of the Original Equipment Manufacturer (OEM) market stating: "… we do sell more engines to OEMs than we do finished product."  (See Deposition of Steve Bailey, June 13, 2007, page 88, lines 17-19, attached as Exhibit "21" to Plaintiffs' Response to Defendant Honda's Statement of Undisputed Facts)

In short, Honda went out of its way to have a likelihood of confusion survey in which less than 3% (8 out of 316) of the participants were in the relevant market sector.  And since Honda's

survey expert, George Mantis, has done a survey in a similar "forward" likelihood of confusion case where he surveyed the potential customers for both products, he knew very well to look to the OEMs to determine confusion. Obviously, Honda did not want an honest survey.

Equally obviously, surveys which avoided the market knows to be the relevant one, done by an expert who knows which market to survey, are not only inadmissible substantively, but at a minimum admissible to show Honda's "bad faith" and Honda's own knowledge that its claim is a "sham".

## IV.

### AT A MINIMUM, THE SURVEYS SHOULD NOT BE ADMISSIBLE TO SHOW HONDA'S "GOOD FAITH"

Plaintiffs contend that the "cherry-picking" of rental markets in the surveys commissioned by Honda, combined with the overwhelming proof that Honda knew that the relevant customers were OEM's and omitted from the surveys, shows that the purported "surveys" were simply "after the fact" efforts by a mega-corporation with huge law firms to "gin up" some type of study that allows Honda to claim that it had some "good faith" basis to litigate this matter. Obviously, Honda knew that it was surveying the wrong market, as did its expert. Thus, they are actually evidence of Honda's "bad faith" – at least of its knowledge of any lack of any legitimate claim when it wrote the July 10, 2003 letter.

Although Plaintiffs believe the Court may consider these surveys as admissions by defendant Honda of its bad faith, at a minimum, the surveys should not be admissible as offered by Honda for any purpose at the summary judgment stage. Directly on point is *O'Grady v. Twentieth Century Fox Film Corp*. 2003 WL 24174616 (E.D.Tex.,2003), which stated as follows about a Gabriel Gelb survey offered there:

> Defendants object to the Gelb Report and Survey for failure to implement and maintain "standards and controls" that would support the reliability of the Survey utilized by Gelb in reaching his opinions as required by *Federal Rule*

9

>*of Evidence* 702. Defendants attack the methods utilized by Gelb in constructing and conducting his Survey, thus challenging the reliability of the results and Gelb's opinions based on those results. Specifically, Defendants assert the Survey is flawed in several respects, including having an (1) unrepresentative survey universe, (2) failure to incorporate any form of control to measure error or bias, and (3) using leading and ambiguous question structures and sequences.

***In ruling on Defendants' motions for summary judgment, the Court will not rely on the Gelb Report and Survey***. The Court reserves its ruling on the reliability of the Survey.

## V

## CONCLUSION

In short, Plaintiffs object to Honda offering either the Gelb or Mantis survey into evidence. At a minimum, this Court should do what the Court did in *O'Grady v. Twentieth Century Fox Film Corp.* 2003 WL 24174616 (E.D.Tex.,2003) – withhold its ruling on the Gelb survey, as offered by Honda, at this stage.

However, Plaintiffs believe that these surveys are admissible to show Honda's "bad faith" – its knowledge that it had no basis to send the July 10, 2003 letter, its knowledge that it had no reasonable likelihood to prevail in this case, and its desire to force Plaintiff PowerTrain "to the mat" anyway. The following points are key:

1. Neither survey was done at the time of the July 10, 2003 letter.

2. Neither survey was done at the time Honda filed its counterclaim in this case in early 2004;

3. Neither survey was done at the time that Honda's counsel telephoned a witness listed by Plaintiffs to intimidate the witness and customer into ceasing business with Plaintiffs;

4. The Mantis survey was not done until over a year after that;

5. The Gelb survey "cherry-picked" a narrow market segment dominated by Honda to skew the results of the survey. Not surprisingly, a number of people in that market segment could

identify a Honda engine. Honda then utilizes that narrow universe, populated by Honda customers, to conclude that, throughout the vastly larger small engine market, its engine has "secondary meaning."

6. The Mantis survey similarly ignored the relevant market segment – potential users of the "junior" product- PowerTrain's. That market segment is OEMs, of whom a statistically insignificant 2.5% were surveyed. It is clear from the evidence that Honda knew that the proper "universe" was OEM's. It is also clear from a 2003 case that Mr. Mantis knew that that was the proper universe to survey. That defendant Honda and Mr. Mantis deliberately "cherry-picked" a different market segment in which defendant Honda has dominance shows that they had no good faith desire to show "likelihood of confusion" among potential purchasers, or even had good faith belief that there really was a "likelihood of confusion" among potential purchasers, which it is their burden to show. Instead, defendant Honda just wanted to create a lawyer's argument that defendant Honda had "good faith" in taking actions years before. The only way defendant Honda could be certain to create that lawyer's argument was to deliberately pick a "universe" it knew to be incorrect.

Respectfully submitted, this the 29th day of June, 2007.

s/William H. Shawn
William Henry Shawn, Esq., Pro Hac Vice
ShawnCoulson, LLP
1850 M. Street, N.W., Suite 280
Washington, D.C. 20036-5804
Tel: (202) 331-2300
Fax: (202) 331-0726

s/William R. Wheeler, Jr.
William R. Wheeler, Jr., Esq., MBN 10848
Wheeler & Franks Law Firm, P.C.
114 South Broadway, P.O. Box 681
Tupelo, MS 38802
Tel: (662) 842-0380
Fax: (662) 842-7491

s/James E. King
James E. King, Esq., CA Bar # 90103
KingLaw Corporation
110 West "C" St., Suite 1014
San Diego, CA 92101
Tel: (619) 236-0303
Fax: (619) 338-8011

Counsel for Plaintiffs

**CERTIFICATE OF SERVICE**

I, hereby certify that on June 29, 2007, I electronically filed the foregoing with the clerk of the Court using the ECF system which sent notification of such filing to the following: William Grant Armistead, Matthew S. Bellinger, Raymond Buendia, Taylor A. Cates, Richard F. Cauley, John R. Chiles, Lamar Bradley Dillard, Robert D. Gholson, Michael J. Gill, Douglas F. Halijan, Eric F. Hatten, Mark G. Matuschak, Guy W. Mitchell, III, Steven Nataupsky, Thomas Parker Olson, William D. Prestage, Jonathan D. Redgrave, Robert H. Walker, Daniel P. Wallace, and Howard P. Walthall, Jr., and I hereby certify that I have mailed by United States Postal Service the document to the following non-ECF participants: Zhejiang Ever Fine Electric Appliance Group Co., Ltd., and Shaoxing Tongyong Engine Mading Company.

s/William R. Wheeler, Jr.